UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GARDITH S. LEMY, *et al.*,

    Plaintiffs,

v.                                                                                  CASE NO.: 8:11-cv-2722-T-23AEP

DIRECT GENERAL FINANCE
COMPANY, *et al.*,

    Defendants.
    _____/

## **ORDER**

    Gardith Lemy and Marilyn Hill sued eleven defendants ("the insurers") for allegedly selling worthless and illegal surplus line automobile insurance. In this order two of the eleven will presently need the distinction of a name: Certain Underwriters at Lloyd's (the surplus line insurer) and Direct General (the producing agent). Dismissing the action, a June 19, 2012, order (Doc. 125) concludes (1) that the policy Lemy and Hill each bought ("the Policy") sufficiently complies with the Florida insurance code, (2) that the sections of the code Lemy and Hill raise provide no private right of action, and (3) that the allegation of the insurance's worthlessness lacks support and appears spurious. Lemy and Hill move (Doc. 130) for reconsideration.

    Lemy and Hill allege that one or more of the insurers violated the surplus line law's eligibility and approval requirements. More distinctly, Lemy and Hill allege a

violation of Section 626.924, Florida Statutes, which requires a surplus line policy to include two specific disclaimers; Section 626.916(1)(a), which requires a diligent search for a general line before the sale of a surplus line; Sections 627.062 and 627.0651, which regulate a general line policy's price; Section 627.410, which requires a general line insurer to report policy information to the Office of Insurance Regulation ("the Office"); and Section 627.8405, which prohibits the financing of an automobile club membership or of a product "not regulated" by the insurance code. The June 19th order explains that the Office's approval of the underwriters conclusively resolves whether the underwriters qualify as an eligible surplus line insurer; that only immaterial infractions of Sections 626.916(1)(a) and 626.924 occurred; that none of Chapter 627, which regulates general line insurance, applies to the insurers; and that no violation of Section 627.8405 occurred because the insurance code regulates the policy and because the policy is not an automobile club membership.

Attempting to revive the possibility that the insurers violated the rate or reporting requirements of Chapter 627, Lemy and Hill quote Section 626.913(4), which states, "the provisions of Chapter 627 do not apply to surplus lines insurance authorized under . . . the Surplus Lines Law." Lemy and Hill contend that an infraction of the diligent search requirement renders the Policy "unauthorized" by the surplus line law. By definition, however, each surplus line agent never satisfies many of Chapter 627's requirements. Lemy and Hill in effect propose that each violation

of the surplus line law by a surplus line agent automatically constitutes many violations of Chapter 627.  Neither the statute nor Lemy and Hill provides support for this reading of "authorized."  Most likely, "authorized" connotes insurance sold by an out-of-state insurer, such as the underwriters, that the Office has "authorized" to sell surplus line insurance.

Lemy and Hill again seek to force the underwriters to prove they qualify as eligible surplus line insurers.  The surplus line law, according to Lemy and Hill, "provides the *only* criteria by which an insurer can become an eligible surplus line insurer."  (emphasis in original).  But the question is not "are the underwriters eligible?"  The question is "who enjoys the authority to decide if the underwriters are eligible?"  In answer to that question the surplus line law leaves no doubt; Section 626.914(2) says that an "eligible surplus lines insurer" is an insurer "made eligible by the Office to issue insurance coverage under this Surplus Lines Law."

The motion for reconsideration discusses purportedly new evidence that, Lemy and Hill claim, shows the insurers knowingly and regularly violated Section 626.916(1)(a)'s diligent search requirement.  Lemy and Hill obtained the "new" evidence in April, May, and early June, 2012 – before the action suffered dismissal.  A motion to reconsider a dismissal may not raise evidence that the moving party possessed before the action ended.  *See Sanderlin v. Seminole Tribe of Fla.*, 243 F.3d 1282, 1293 (11th Cir. 2001) (citing *Mays v. USPS*, 122 F.3d 43, 46 (11th Cir. 1997)).  In any event, most of what Lemy and Hill submit proves too much.  The evidence

- 3 -

documents Florida's investigation and sanction of a Direct General agent who failed to complete proper diligent searches; that is, the evidence shows the state fulfilling the duty to enforce regulations for which no private cause of action exists.

As the June 19th order explains, no section that Lemy and Hill allege the insurers violated provides a private right of action. In consequence, even if they prove a violation of Section 626.916(1)(a) or of another section at issue, Lemy and Hill lack the right to sue. Although Lemy and Hill again ask the judiciary to infer a statutory or common law right of action, sound reason, binding authority, and the arc of history confirm that creating a right of action in this instance would impinge the authority of the legislature.

Like the United States Constitution, the Florida Constitution separates the executive, the legislative, and the judicial power. The Florida Constitution proceeds a step farther than the national charter and expressly enshrines the separation; Article II, Section 3, states, "no person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein." The legislature enjoys the exclusive power to enact substantive law, the law that "creates, defines, and regulates rights." *Southeast Floating Docks, Inc. v. Auto-Owners Ins. Co.*, 82 So.3d 73, 78 (Fla. 2012). Judicially inventing a right to sue – based on a statute that provides no right to sue – arrogates to the judiciary a power of the legislature.

Judicial creation of a substantive right ignores not only the formal separation of powers but also the legislature's superior legislative competence.  The legislature gathers data, consults experts, publicly debates, finally compromises, and soon accounts electorally to the citizenry for the result.  Compared to the legislature, the court is blinkered and remote, constricted always by the narrow perspective of party-driven, preeminently adversarial, case-by-case adjudication.  Further, in most cases only a statute's text equips the judiciary to say what a statute's "purpose" demands.  Even if one accepts the dubious notion that a legislature's many minds can coalesce on a single purpose or even on a set of coherent purposes, only a statute's textual details – the individual provisions – specify how far and in what manner the legislature pursues the statute's aims.  *See MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 n.4 (1994); *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987); Kenneth A. Shepsle, *Congress is a "They," not an "It": Legislative Intent as Oxymoron*, 12 INT'L REV. L. & ECON. 239 (1992).  To conceive a statute's "purpose" too broadly, too generally, or at a too remote level of abstraction, while subordinating the statute's text, promotes promiscuous judicial speculation and other judicial mischief.  *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 18-21 (2012).

The judiciary's inability to resolve a dispute of general policy connects to a greater impairment – democratic unaccountability.  The judge's power to write law

mirroring the judge's sense of justice belongs to an era that lacked a popular branch of government.

For much of the last millennium the English judge could invoke "the equity of the statute" to expand or constrict a law beyond the law's terms. But the power to wield a roving equity in statutory interpretation arose in a political system with no meaningful separation of powers. England's written law began as the decree of the royal sovereign, with a small group of the King's closest judges and councillors drafting legislation. To a medieval common law judge – at the time a mere agent of the King – writing the law and interpreting the law looked like one activity occurring at different times.

> The famous Chief Justice Hengham [Chief Justice of the Common Pleas from 1301 to 1309], for example, settled a difficult question in these words, "We agreed in Parliament that the wife if not named in the writ should not be received," and when counsel suggested an interpretation of another statute, Hengham again had an authoritative answer. "Do not gloss the statute," he said, "for we know better than you; we made it." In short, the court was well aware of the intention of a statute because the judges had had the biggest share in making it, and consequently there was little difficulty; the law-maker was simply explaining his own policies.

THEODORE F.T. PLUCKNETT, A CONCISE HISTORY OF THE COMMON LAW 331 (5th ed. 1956); *see also id.* at 141-42, 321-22, 328-35; John F. Manning, *Textualism and the Equity of the Statute*, 101 COLUM. L. REV. 1, 36-54 (Jan. 2001).

Not surprisingly, the judge's use of the King's discretion faded as the judiciary gradually separated from the King and as Parliament asserted the authority to create the law. Although the power to pursue "the equity of the statute" persisted (perhaps

merely as a tradition or a relic) even after the Glorious Revolution of 1688, a maturing separation of powers in government naturally coincided with the rise and eventual dominance of textualism in the British judiciary during the nineteenth and twentieth centuries. *See* Manning, 101 COLUM. L. REV. at 52-56; PLUCKNETT, *supra* at 340; William N. Eskridge, Jr., *Statutory Interpretation and Legislation*, in THE OXFORD INTERNATIONAL ENCYCLOPEDIA OF LEGAL HISTORY (2009); *see also* Gareth Jones, *Should Judges Be Politicians? The English Experience*, 57 IND. L.J. 211, 221-27 (1982).

The United States Supreme Court briefly considered something like pronouncing "the equity of the statute" to accompany the judicial role. *J.I. Case Co. v. Borak*, 377 U.S. 426 (1964), infers a private right of action for a statute more or less on the ground that a cause of action seemed desirable. But the judicial creation of a statutory cause of action independent of congressional intent ended soon after Justice Powell, in a dissent in *Cannon v. University of Chicago*, 441 U.S. 677, 730-31 (1979), observed that *Borak* and its kind warp the separation of powers. Justice Powell's view prevailed in *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575-78 (1979), and triumphed in *Alexander v. Sandoval*, 532 U.S. 275, 286-88 (2001), which concludes that the modern federal judge may not practice the discretion of the English common law judge:

> Private rights of action to enforce federal law must be created by Congress. []. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. []. Statutory intent on this latter

> point is determinative. []. Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute. Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals.

532 U.S. at 286-87 (citations omitted); *see also Love v. Delta Air Lines*, 310 F.3d 1347, 1351-54 (11th Cir. 2002); *Scattered Corp. v. Chicago Stock Exchange, Inc.*, 98 F.3d 1004, 1005-07 (7th Cir. 1996) (Easterbrook, J.).

As currently understood, the common law provides no basis for creating a right of action, either. The common law's independent power flashes iridescently in *Dr. Bonham's Case*, 77 Eng. Rep. 646, 652 (C.P. 1610), in which Lord Coke wrote, "in many cases, the common law will controul acts of parliament, and sometimes adjudge them to be utterly void." Coke probably meant to assert less than a modern reading of his words suggests, but any notion that common law equals natural or fundamental law waned long ago. *See* Nathan Chapman & Michael McConnell, *Due Process as Separation of Powers*, 121 YALE L.J. 1672, 1689-91 (May 2012); T.F.T. Plucknett, *Bonham's Case & Judicial Review*, 40 HARV. L. REV. 30, 58-59 (Nov. 1926). "Law in the sense in which courts speak of it today does not exist without some definite authority behind it." *Erie R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938) (quoting *Black & White Taxicab v. Brown & Yellow Taxicab*, 276 U.S. 518, 533-34 (1928) (Holmes, J., dissenting)). A judicially invented right of action based on the common law suffers the same formal and practical deformities as a judicially invented right of action based on "the equity of the statute."

Congruent with both the United States Supreme Court and the Florida Constitution, the Florida Supreme Court declines to infer a private right of action not created by the legislature. Although the legislature's intent is sometimes called the "primary factor" revealing an implied right of action, the authority – in accord with the separation of powers – treats legislative intent as the only pertinent consideration. *QBE Ins. Corp. v. Chalfonte Condo. Apt. Assoc., Inc.*, ___ So.3d ___, 2012 WL 1947863 (Fla. 2012) at *11 ("[we] conclu[de] that courts cannot provide a remedy when the Legislature has failed to do so") and *12 ("we . . . find that an insurer's failure to comply with [the statute] does not render a noncompliant . . . provision in an insurance policy void and unenforceable, because the Legislature has not provided for this penalty"); *Horowitz v. Plantation Gen. Hosp. L.P.*, 959 So.2d 176 (Fla. 2007) at 182 ("whether a statutory cause of action should be [inferred] is a question of legislative intent") and 186 ("it is outside this Court's purview to [infer] a statutory cause of action . . . where none was intended by the Legislature"); *Villazon v. Prudential Health Care Plan, Inc.*, 843 So.2d 842, 852 (Fla. 2003) ("absent [an] expression of intent, a private right of action is not implied"); *Murthy v. N. Sinha Corp.*, 644 So.2d 983, 986 (Fla. 1994) ("we decline to infer any civil liability as there is no evidence . . . of a legislative intent to create a private remedy").

A statute's text and structure display the legislature's intent. *QBE*, ___ So.3d ___, 2012 WL 1947863 at *9; *State v. Dogan*, 685 So.2d 1210, 1212 (Fla. 1996). As for the sections of the insurance code raised by Lemy and Hill, the text shows no

private right of action and the structure signals a deliberate omission. If the legislature chose to permit insurance regulation through private enforcement, the insurance code explicitly allows private enforcement; but if the legislature chose to limit insurance regulation to agency oversight, the insurance code omits private enforcement and explicitly allows (comprehensive) agency oversight. (Doc. 125 at 14); *QBE*, ___ So.3d ___, 2012 WL 1947863 at *10; *see also Horowitz*, 959 So.2d at 184-85; *Alexander*, 532 U.S. at 290. Perhaps most legislators concluded that an agency best monitors compliance with insurance minutiae, such as the size and font of a required disclaimer, that affect the overall quality of the insurance market. *See QBE*, ___ So.3d ___, 2012 WL 1947863 at *9 (citing *Murthy*, 644 So.2d at 986)). Perhaps most legislators concluded that only an expert (full-time, specialist) insurance regulator should interpret and enforce most of the Byzantine insurance code. Perhaps most legislators concluded class action litigation constitutes an inconsistent, inefficient, and expensive vehicle by which to enforce a regulatory licensing, reporting, or due diligence requirement. Whatever the reasons, the legislature chose to provide no private right of action, and – in accord with the separation of powers – the judiciary cannot ignore the legislature's choice.

Lemy and Hill raise *Foundation Health v. Westside EKG Associates*, 944 So.2d 188, 195 (Fla. 2006), which, citing *Citizens Insurance Co. v. Barnes*, 124 So. 722, 723 (Fla. 1929), invokes the maxim that an insurance contract incorporates "surrounding" statutory law. In *Foundation Health* an HMO violated a section of the

HMO Act requiring the prompt payment of a claim. *Foundation Health* concludes that an HMO contract incorporates the prompt payment requirement because the requirement serves an "integral role" in, and provides "essential substance" to, the rights of a subscriber. 944 So.2d at 196. *Foundation Health* cites also *State Farm Fire and Casualty Co. v. Palma*, 629 So.2d 830 (Fla. 1993), which holds that an insurance contract incorporates the section of the insurance code guaranteeing an attorney's fee if an insured wins a lawsuit against an insurer. According to *Palma*, the attorney's fee section resides in each insurance contract both "because the [section] applies in virtually all suits" involving an insurance contract and because the insurance code requires that an insured's judgment include fees. 629 So.2d at 832.

If an HMO contract or an insurance contract incorporated the entire HMO Act or the entire insurance code, *Foundation Health* and *Palma* would both look different. Neither decision would incorporate a statutory section specifically because the section provides "essential substance" to a contract or because the section "applies in virtually all suits" involving a species of contract. Further, the modern view on inferring a cause of action into a statute reveals the flaws of inferring a statute into a contract. Again, Lord Coke notwithstanding, the common law may not evade the legislature. Unless a statute displays the necessary legislative intent, no meaningful distinction exists between judicial creation of a statutory right of action and judicial creation of a common law right of action. *Buell v. Direct Gen. Ins. Agency, Inc.*, 267 Fed.Appx. 907, 909-10 (11th Cir. 2008); *accord Am. Auto. Ins. Co. v. McDonald*, 812

So.2d 309, 311-12 (Ala. 2001). Under *Foundation Health* and *Palma* – and in accord with the separation of powers – the law "surrounding" a contract includes far less than a full regulatory scheme. (Conduct that violates a statute providing no claim can, of course, trigger a common law claim independent of the statute. That occurred in *Villazon v. Prudential Health Care Plan, Inc.*, 843 So.2d 842, 852 (Fla. 2003), which Lemy and Hill mistakenly read as allowing a common law right of action because of a statutory violation.)

*Foundation Health* promotes a prompt claim payment, and *Palma* facilitates the pursuit of a claim payment in court. Stated as a rule, *Foundation Health* and *Palma* (and *Barnes*) directly and materially help an insured obtain a claim payment from an insurer evading payment by delay, stingy contract interpretation, or other mischief. By contrast, the sections of the insurance code that Lemy and Hill raise do not affect claim payment. The Policy displays the coverage purchased, and Lemy and Hill never allege they received less than the policy promises.

An insurance claimant suffers a loss, often a harrowing loss that leaves the claimant vulnerable and in desperate need of assistance. If a claimant paid an insurer to provide assistance and the insurer shirks its responsibility in the claimant's time of need, the claimant can present a compelling (even if legally unsound) case for using a statute providing no private right of action to corral the insurer into paying the claim. Using statutory sections benefitting the insured public at large, Lemy and Hill want to grind the expensive gears of litigation and vindicate Lemy and Hill's opinion that

the insurers offer poorly priced insurance. Neither the insurance code nor the maxim of "incorporation" authorizes this lawsuit. Lemy and Hill cannot play insurance regulator, and they cannot treat the court as a customer service department.

Unable to sue based on a statutory violation, Lemy and Hill contend that they nonetheless pleaded facts establishing the Policy's unconscionably poor value. For support Lemy and Hill cite a paragraph of the third amended complaint that merely asserts the Policy is "essentially worthless, illusory, and unconscionable." Lemy and Hill present a conclusion, a literal "value judgment," without supporting facts. The assertion of worthlessness lacked plausibility even before the insurers showed that the Policy provides about $48,000 in excess coverage for expenses likely to arise after a car accident.

Raising a new argument, Lemy and Hill assert that the Policy's $170 annual premium is "unconscionable relative to the available coverage" because the odds of a claim accruing are "exceedingly low." "Defendants' sale of [the Policy]," Lemy and Hill try to explain, "is like selling an optional flood insurance policy . . . to someone who lives in the middle of the desert." Purchasing flood insurance in the desert is not necessarily a bad idea. *Cf.* Charles Bryant, *Dangers of the Desert: Flash Floods and Sandstorms*, HOWSTUFFWORKS, http://adventure. howstuffworks.com /survival /wilderness /desert-survival7 .htm; *Stay Safe During Flash Flood Season*, CITY OF LAS VEGAS, www. lasvegasnevada. gov /Find /26921.htm (both visited Aug. 6, 2012). At any rate, the intended point fails. To support the main conclusion (that the

premium is too high) Lemy and Hill proffer another unsupported conclusion (that a claim under the policy is rare). Nothing besides Lemy and Hill's say-so suggests that, given the probability of a major car accident, the Policy's coverage fails to legally justify the Policy's price.

More than three-and-a-half years after this action started Lemy and Hill want to submit a fifth complaint. Although only the most recent complaint suffered a dismissal, the dismissal occurred largely because of a legal defect that Lemy and Hill cannot overcome. And when their motion presented a new chance to allege useful facts about the Policy's value, Lemy and Hill asserted new baseless conclusions. Allowing another complaint would waste time and money.

For the reasons stated in the June 19th order and in this order, the motion (Doc. 130) is **DENIED**.

ORDERED in Tampa, Florida, on August 14, 2012.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE